

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION NO. 1:10-CV-510-TH JURY |
| DYNMCDERMOTT PETROLEUM OPERATIONS COMPANY, | § § § | |
| *Defendant.* | § § | |

# AMENDED MEMORANDUM OPINION AND ORDER

Before the Court is *Defendant's Amended Motion for Summary Judgment* [Clerk's Docket No. 40], filed on July 8, 2011, and the parties' responsive filings thereto [Clerk's Docket Nos. 59, 74, 84, 100, 106, 107, 109, 110, 111]. Having considered the filings, the summary judgment record, and the applicable law, the Court will grant the motion.

### BACKGROUND

The EEOC filed this case on behalf of the Charging Party, Phillip Michael Swafford. In February 2008, Swafford applied for a position at DynMcDermott's Big Hill site, one of the locations DynMcDermott manages as part of the Strategic Petroleum Reserve. Swafford sought employment as a Maintenance Planner-Scheduler ("scheduler position"), a position he had previously held with DynMcDermott. At the time he applied, Swafford was fifty-six years old, and his wife had cancer. After completing the interview process, DynMcDermott hired Mark Thomas, who was under forty years old at the time.

The EEOC asserts claims under the ADEA and the ADA, arguing that DynMcDermott

discriminated against Swafford based on his age and his association with a family member with a disability.  DynMcDermott moves for summary judgment on the EEOC's claims under the ADA and the ADEA and its claims for liquidated damages under the ADEA and for punitive damages under the ADA.

The relevant undisputed facts are as follows.  In early 2008, DynMcDermott had an opening for one of three scheduler positions at Big Hill.  The other two scheduler positions were filled by June DuBois, the lead scheduler, and Danelle Houston.  Both ladies worked with Swafford when he was a scheduler from 1998 through 2000.  When the third scheduler position became available in 2008, DuBois contacted Swafford and encouraged him to apply.  Swafford applied on February 1, 2008.

Ray Wood was the maintenance manager at Big Hill during 2008, and the schedulers reported to him.  As such, he was also the hiring manager for the open scheduler position.  Tim Lewis was the site director at Big Hill and Wood's manager.

Tim Lewis reported to DynMcDermott's director of operations and management, Deborah Hojem, at DynMcDermott's headquarters in New Orleans, Louisiana.  Dione Heusel, also in New Orleans, was DynMcDermott's director of human resources.

In early 2008, Lewis expressed concern over the aging workforce at Big Hill.  Both schedulers, DuBois and Houston, were scheduled to retire in the near future.  In their declarations, DuBois and Houston discussed "benefits meetings and trainings [sic]" during which Heusel and other, unnamed DynMcDermott managers discussed the aging workforce and its impact on the workplace and on benefits.  *See* CLERK'S DOCKET NOS. 59-3, 59-4.  They also declared that Lewis discussed this issue at various weekly meetings.  *Id.*

Lewis was responsible for Wood's performance evaluations.  Wood's raises and pay were dependent on the performance evaluations.   Throughout most of their time together at DynMcDermott, Wood and Lewis were friends.  However, following Hurricane Rita in September 2005, a dispute arose between the two which ended their friendship.  They continued to work together, but their interactions became entirely job-related, as opposed to both work and personal as they had been before.  Wood believed that Lewis cut him off from communications from corporate that Lewis had typically shared with all the managers.  Wood was not issued a corrective action memorandum ("CAM") or otherwise disciplined over the Rita-related incident.

Ray Wood, June DuBois, and Deborah Hojem comprised the hiring committee and conducted the interviews of the selected candidates.  Both Swafford and Thomas were interviewed along with a third candidate.  As a former scheduler, Swafford had experience with the scheduling software program, SAP, used at Big Hill.  Thomas used SAP software during his military career. Wood signed a "Candidate Evaluation Form" on which Thomas scored one point higher on "Education" than Swafford.  Swafford and Thomas scored the same on the remaining categories.

The events giving rise to the present dispute occurred shortly after Swafford applied for the open scheduler position in early February 2008.  Lewis wrote several emails and made multiple comments about Swafford's age and his wife's cancer.  These events comprise the crux of the EEOC's arguments:  that Lewis's actions are direct evidence of discrimination or of his influence over the discriminatory decision to not hire Swafford, and that there is sufficient circumstantial evidence of discrimination to preclude summary judgment.  The EEOC does not allege that any other DynMcDermott employee, absent Lewis's influence, discriminated against Swafford.  The Court will discuss the events in detail below.

## SUMMARY JUDGMENT STANDARD

A party moving for summary judgment must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law on each challenged claim. Fed. R. Civ. P. 56(a). The movant bears the initial burden of identifying those portions of the record that it believes demonstrate the absence genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has done so, the non-movant must set forth specific facts raising genuine issues for trial on each of the challenged claims. *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). The court views the evidence in the light most favorable to the non-movant. *Id.* (citing *Matsushita*, 475 U.S. at 587). "Conclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment." *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

## APPLICABLE LAW

The ADEA prohibits employment discrimination based on age, stating that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). "A plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross v. FBL Fin. Svcs., Inc.*, 129 S.Ct. 2343, 2351, 174 L. Ed. 2d 119, 129 (2009) (parentheses in original) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-143, 147 (2000)).

Under the ADA, a covered employer may not discriminate against an individual because of

-4-

that individual's disability or because of his relationship or association with an individual with a known disability.   42 U.S.C. § 12112(a), (b)(4).[1]   Although perhaps called into question by the Supreme Court's decision in *Gross* that the "because of" language in the ADEA requires a showing of "but for" causation, *Gross*, 129 S.Ct. at 2351, 174 L. Ed. 2d at 129, the prevailing Fifth Circuit precedent provides that "'[u]nder the ADA, discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision making process and have a determinative influence on the outcome.'"[2]  *Pinkerton v. Spellings*, 529 F.3d 513, 518 (5th Cir. 2008) (internal quotations omitted) (quoting *Soledad v. U. S. Dep't of Treasury*, 304 F.3d 500, 503-04 (5th Cir. 2002)); *Shepherd v. Goodwill Indus. of S. Tex., Inc.*, Civil Action No. C-10-313, 2011 WL 3055231, at *7 (S.D. Tex. July 25, 2011).

A plaintiff may prove its discrimination case through either direct or circumstantial evidence. *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994) (citation omitted). "Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption."  *Id.* at 328-29 (brackets in original) (quoting *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)).   "Because direct evidence is rare in discrimination cases a plaintiff ordinarily must rely on circumstantial evidence." *Mercer v. Capital Mgmt. & Realty, Inc.*, 463 F. Supp. 2d 620, 626 (E.D. Tex. 2006) (Davis, J.) (citing *Scott v. Univ. of Miss.*, 148 F.3d 493, 504 (5th Cir. 1998)).

---

[1] Because the challenged actions occurred in February 2008, prior to the effective date of the 2008 revisions to the ADA, the Court refers to the pre-amendment language of the ADA.  *See* ADA AMENDMENTS ACT OF 2008, Pub. L. No. 110-325, 122 Stat. 3553, § 5 (2008) (amending 42 U.S.C. section 12112(a) by striking "with a disability because of the disability of such individual" and adding "on the basis of disability"); *Cooper v. United Parcel Svc., Inc.* 368 Fed. Appx. 469, 475 n.5 (5th Cir. 2010) (citing *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009) (noting that the ADA Amendments Act of 2008 does not apply retroactively)).

[2] Regardless of whether the "but for" or "motivating factor" standard applies under the ADA, the Court concludes that the evidence fails to satisfy either of these standards.

When the plaintiff presents circumstantial evidence to satisfy its summary judgment burden, courts follow the burden-shifting framework of *McDonnell Douglas*. *See EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009) (citation omitted) (applying framework to ADA claims); *see also Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378 (5th Cir. 2010) (citation omitted) (applying framework in ADEA case). Summarizing, under *McDonnell Douglas*, the burdens shift as follows: (1) plaintiff establishes a prima facie case of discrimination; (2) defendant offers a non-discriminatory reason for its action; and (3) plaintiff rebuts defendant's reason. *See Jackson*, 602 F.3d at 378 n.12 (quoting *Reeves*, 530 U.S. at 142-43). Within this framework, the defendant's burden is merely one of production, and no credibility assessments are made. *Id.* "'Although intermediate evidentiary burdens shift back and forth under this framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 378 (citation and internal quotation marks omitted).

In an ADEA case, the plaintiff's prima facie burden is to show that

> (1) he was over the age of forty at the time he was not selected; (2) he was qualified for the position he sought; (3) he was not selected; and (4) either (a) a candidate outside his protected class was hired, (b) someone younger was hired, or (c) he was otherwise not selected because of his age.

*Joseph v. City of Dallas*, 277 Fed. Appx. 436, 439 (5th Cir. 2008) (citing *Berquist v. Wash. Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007) (setting forth prima facie case under ADEA for discriminatory discharge); *McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 462 (5th Cir. 2005) (stating prima facie case "for discriminatory failure to hire under the substantively identical Texas Commission on Human Rights Act")). After the plaintiff establishes its prima facie

case, the burden of production shifts to the defendant to provide a legitimate, non-discriminatory reason for its decision. *Id.* If the defendant produces such a reason, the burden shifts back to the plaintiff to show that the reason given was pretext for discrimination. *Hixson v. Houston Indep. Sch. Dist.*, Civil Action No. 4:09–cv–3949, 2011 WL 3648104, at * 16 (S.D. Tex. Aug. 17, 2011) (citing *Price v. Fed. Express Corp.*, 283 F.3d 715, 721-23 (5th Cir. 2002)).

The Fifth Circuit has not reviewed an associational claim under the ADA, but district courts within the Fifth Circuit have adopted the Tenth Circuit's elements for a prima facie case of associational discrimination under the ADA. *Collins v. Sailormen, Inc.*, 512 F. Supp. 2d 502, 508 (W.D. La. 2007) (citing *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir. 1997)); *see Spinks v. Trugreen Landcare, L.L.C.*, 322 F. Supp. 2d 784, 795 (S.D. Tex. 2004); *Moresi v. AMR Corp.*, No. CA 3:98–CV–1518–R, 1999 WL 680210, at *2-3 (N.D. Tex. Aug. 31, 1999). Under *Den Hartog*, a plaintiff establishes a prima facie case of associational discrimination by showing that

> (1) she was "qualified" for her job at the time of the adverse employment action; (2) she was subjected to adverse employment action; (3) she was known by her employer at the time to have a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.

*Collins*, 512 F. Supp. 2d at 508 (citing *Den Hartog*, 129 F.3d at 1085). If the plaintiff successfully puts forth a prima facie case, a presumption of discrimination arises, and the defendant must produce a legitimate, non-discriminatory reason for the challenged action. *See Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 865 (S.D. Tex. 2010) (citation omitted). Once the defendant does so, the presumption falls away "and the plaintiff must show that the employer's articulated reason for its action is merely a pretext for [discrimination], or if true, is only one reason for its conduct and another motivating

factor is plaintiff's protected characteristic." *Id.* (citation omitted); *see Shepherd*, 2011 WL 3055231 at *7 (quoting *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007)).

"Under the ADEA, liquidated damages are only payable for 'willful' violations." *Tyler v. Union Oil Co. of Ca.*, 304 F.3d 379, 398 (5th Cir. 2002) (quoting 29 U.S.C. § 626(b)).  "A violation is willful 'if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.'" *Id.* (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 614 (1993)). Punitive damages are available under the ADA when the evidence shows that "the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)).

## ANALYSIS

DynMcDermott contends that the EEOC cannot produce either direct or circumstantial evidence of discrimination sufficient to generate genuine fact issues for trial.  Further, DynMcDermott argues that there is no evidence that it acted willfully or with malice or reckless indifference.  The EEOC argues that Lewis's actions and words are sufficient direct evidence to overcome summary judgment, or, failing that, circumstantial evidence exists to preclude summary judgment.

## I.    Direct Evidence

The EEOC first argues that Lewis's statements are direct evidence of discrimination.  Lewis's remarks may be direct evidence of discrimination if they are (1) related to age or to Swafford's association with someone with a disability; (2) proximate in time to the decision to not hire Swafford; (3) made by someone with authority over the decision; and (4) related to the decision to

-8-

not hire Swafford.  *See Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 608 (5th Cir. 2007) (citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655 (5th Cir. 1996)); *see also Laxton v. Gap, Inc.*, 333 F.3d 572, 583 n.4 (5th Cir. 2003) ("[The Fifth Circuit continues] to apply the *CSC Logic* test when a remark is presented as direct evidence of discrimination apart from the *McDonnell-Douglas* framework.").  The EEOC further asserts that Wood was merely Lewis's cat's paw, acting as a rubber stamp for Lewis's discrimination.  "To invoke the cat's paw analysis, [the plaintiff] must submit evidence sufficient to establish two conditions: (1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'"  *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)).  The Court disagrees with both contentions because Lewis did not have authority over the decision regarding Swafford and because the evidence would require the drawing of inferences.

The EEOC alleges that on February 4, 2008, Lewis went to the schedulers' office and spoke with DuBois and Houston, the two schedulers.  According to DuBois and Houston, Lewis told them that he opposed hiring Swafford because of Swafford's age and because Swafford would have to miss work to care for his wife due to her having cancer.  CLERK'S DOCKET NOS. 59-3, 59-4.  Further, Lewis commented that he would like to hire someone "'young'" for the position, perhaps someone "'just out of high school.'"  *Id.*

Also on February 4, 2008, Lewis emailed Hojem, stating that he "may need to get Mike Swafford as a temp to help out until we get a new hire."  *Id.* NO. 59-11.  Significantly, Lewis noted that Wood, DuBois, and Houston wanted to hire Swafford permanently but that "I just put the nix to this . . ." because "[h]is wife has cancer and requires and [sic] lot of his time at home . . ." and

"[h]e is at least 56 and has his own medical problems . . . ." *Id.*  In her deposition, Hojem testified

that she did not remember having ever received the email, and no reply to the email is in the record.

*Id.* No. 74-1.

On February 7, 2008, at the regularly-conducted morning meeting at Big Hill, Wood

mentioned that a review of resumes for the scheduler position was being conducted.  *Id.* No. 40-3,

at *149-50, No. 59-7, at *197.  Wood stated in his deposition that upon raising this issue, Lewis said,

"I do not want you to hire Mike Swafford because of his age and his wife has cancer and he would

probably be missing too much work."  *Id.* No. 40-3, at *150.  Wood responded, "if those are the

requirements, you [can] do the hiring."  *Id.*  Lewis told Wood to stay after the meeting, and,

following the meeting, Lewis informed Wood that he was going to issue Wood a CAM because of

Wood's "insubordination."  *Id.* at *152.  Wood wrote down everything that occurred.  *Id.* at *153.

Shortly thereafter, Wood went to Lewis's office to inform Lewis that Wood would not "break a

federal law for you or anybody."  *Id.*  Wood then called Hojem and discussed the events with her.

*Id.*  He offered to send her his notes, but she asked him to bring them to New Orleans for a meeting

they already had scheduled for the upcoming Tuesday.  *Id.*

Immediately following the meeting, a Department of Energy representative at Big Hill,

Bernadette Nelson, emailed Lewis a link to the EEOC's webpage dealing with age discrimination.

*Id.* No. 59-11.  Lewis responded,

> Actually, I know about this.  It is my responsibility to staff a section with folks who
> can be around a while and continue to contribute . . . Any company with an aging
> work force, as we have, will be looking for personnel who want a career to carry on
> with all the things that have to be done . . . I knew the very moment I even mentioned
> this that there was going to be a potential problem and that I had made a very grave
> mistake.  I should have said that we need to look toward the future relative to whom
> we hire.  What I said, what was understood, and what I meant are all different . . . .

*Id.* Lewis copied Hojem and Heusel on his reply.

Lewis stated in his deposition that during the February 7, 2008 meeting, he mentioned that Swafford is "old" but did not instruct anyone to not hire Swafford. *Id.* No. 59-7, at *197.  At that point, according to Lewis, Wood started repeatedly screaming, "Tim, you're telling me to commit a felony." *Id.*  He does not recall mentioning anything about Swafford's wife having cancer, but he does not dispute Nelson's recollection that he did. *Id.* at *198.  After Wood visited his office, Lewis drafted a CAM regarding Wood's "insubordination in saying [he] would not hire a scheduler . . ." and sent a copy of the CAM to New Orleans because CAMs have to be "approved by HR in New Orleans." *Id.* at *220; *see id.* 59-11.  Lewis discussed the draft CAM with Wood but could not recall whether he actually showed Wood a copy of the draft. *Id.* at *246.  Wood testified that he never received or saw the draft CAM until the day before his deposition. *Id.* No. 40-3, at *154-55.  After receiving a copy of the draft CAM via email, Hojem called Lewis and told him "this [expletive] was going to stop, this CAM was inappropriate, it made no sense[,]" and that "there would be no further action." *Id.* No. 40-4, at *122-23.  Lewis asserted that he did not pursue the CAM further because it was based on Wood's refusal to be responsible for hiring a scheduler, and once Wood decided to do the hiring, a CAM was no longer necessary. *Id.* No. 59-7, at *220-21.

On February 7, after the morning meeting, Lewis emailed several people, including DuBois, Wood, Hojem, and Heusel, informing them that he would be on the "'hiring board'" for the scheduler position. *Id.* No. 59-11.

Also on February 7 after the morning meeting, Lewis called Hojem and told her about the comments he had made. *Id.* No. 40-4, at *53.  Hojem recalled that Lewis said that at the morning meeting, he "indicated that he did not want to hire Mr. Swafford because of his age and the fact that

his wife was ill, and it would cause him to miss work." *Id.* at *42.  Hojem instructed Lewis that the comments were "highly inappropriate and against all our rules and regulations, and that he would not participate at all in the hiring of the planner/scheduler." *Id.* at *42-3.  She told Lewis that he would not be on the hiring board. *Id.* at *43.  Approximately one hour after sending his first email about being on the hiring board, Lewis emailed the same group of people stating that he would no longer be on the hiring board. *Id.* No. 59-11.

On February 11, 2008, Lewis emailed Hojem, Heusel, DynMcDermott's CEO, and DynMcDermott's general counsel, stating in relevant part:

> As expected, when I gave Ray Wood the CAM this morning, he accused me of telling him to commit a felony in front of 20 people (he says he will get statements) by not hiring a person due to age when he was the best candidate.  I might add that he did not even have all the resumes at that time.
>
> As mentioned to you last Thursday when all this happened, during the morning meeting I DID say that we needed to keep age in mind in order to have folks around after we leave.  I also mentioned his wife had cancer that could keep him from coming to work.  I am guilty of being stupid enough to have said that.  This was done "in good faith" to help our 'aging work force' problem. Both of the other schedulers are planning to retire (according to them) in about the next two years. Danelle has said February of 2009.  However, my actions toward hiring "aged" applicants prove otherwise in that I hired Jim Harkins (from PIN) as my ES&H Manager years ago over younger folks and he also had had a stroke with mobility and speech difficulties.

*Id.* (emphasis and parentheses in original).  Wood never received a CAM, nor did he receive any days off as a result of these events.  *See id.* No. 40-3, at *154-55; *id.* No. 40-4, at *122-23.

On February 12, 2008, Wood met in person with Hojem, and they discussed the situation. As she had done when they first visited via telephone on February 7, 2008, Hojem assured Wood that there would be no repercussions or backlash from the incident with Lewis.  *Id.* No. 40-4, at *128-29.  After receiving these assurances, Wood did not have any concerns about who he would

hire due to Lewis's statements and actions, nor did he believe that he had to hire whomever Lewis wanted to hire. *Id.* No. 40-3, at *163-64.

### A.     Decision Maker

The EEOC contends that there is a fact question regarding who was the final decision maker in this case. Hojem, Wood, and Lewis all testified that Wood was the final decision maker, and after he made a decision, he would send in some forms along with his recommendation to human resources. *See, e.g.*, CLERK'S DOCKET NO. 40-4, at *54-7. HR would review the package to make sure no errors had been made, *e.g.*, a gross discrepancy between the candidate's qualifications and the job requirements. *Id.* The evidence shows that HR was simply a rubber stamp, not the final authority, unless a discrepancy arose. If that happened, then, according to Hojem, HR would re-engage with the hiring manager. *Id.* Otherwise, HR would extend the offer to the candidate selected by the hiring manager. There is no question that in this case, Wood was the hiring manager and therefore the final decision maker.

### B.     Inferences

The Court concludes that the evidence referenced by the EEOC does not constitute direct evidence because it requires drawing certain inferences. First, an inference must be made that despite being removed from the hiring process by Hojem, Lewis still played a role in the decision to not hire Swafford. And second, the fact-finder would have to infer that Wood was cowed by Lewis, even though Wood stood up to Lewis during the February 7 morning meeting, never received the threatened CAM, and was reassured by Hojem that no adverse consequences would arise from Lewis's actions and statements. Because the evidence requires inference-drawing, it is not direct evidence of discrimination. *See Knatt v. Hosp. Serv. Dist. No. 1 of E. Baton Rouge Parish*, 327 Fed.

Appx. 472, 485 (5th Cir. 2009) (citing *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 416 (5th Cir. 2003)).

### C.    Stray Remarks

Even if the evidence does not require the fact finder to make inferences, Lewis's statements and actions still amount to mere stray remarks because the EEOC cannot satisfy the third element of the *CSC Logic* test, which requires the comment-maker to be one with authority over the hiring decision. *See Arismendez*, 493 F.3d at 608 (citing *CSC Logic, Inc.*, 82 F.3d at 655). Wood was the final decision maker. Hojem removed Lewis from the hiring process, and there is no evidence that he insinuated himself back into the hiring process at any time thereafter. Lewis's February 4 comments and email came before Hojem intervened. Even when viewed in the light most favorable to the EEOC, there is no direct evidence that Lewis played any role whatsoever in the decision to not hire Swafford.

### D.    Cat's Paw

Regarding the EEOC's cat's paw argument, the Court notes that there appears to be some disagreement about whether this analysis is proper in both direct and circumstantial evidence cases. *Compare Braymiller v. Lowe's Home Centers, Inc.*, No. 07-CV-00196-XR, 2008 U.S. Dist. LEXIS 77433, at *29-30 (W.D. Tex. Aug. 5, 2008) ("In light of the *Reeves* decision, courts in the Fifth Circuit have examined workplace comments in two ways:  under the 'cat's paw' analysis and as direct evidence of discrimination under the *Brown* framework."); *Acker v. DeBoer, Inc.*, 429 F. Supp. 2d 828, 847 (N.D. Tex. 2006) (utilizing cat's paw analysis when considering circumstantial evidence); *Burns v. Check Point Software Techs., Inc.*, No. 3:01-CV-1906-P, 2002 U.S. Dist. LEXIS 21278, at *30-31 (N.D. Tex. Oct. 31, 2002) ("It is a different story when the evidence permits the

-14-

inference that the actual decision makers were influenced by someone else's prejudice . . . .") (citation omitted) *with Hamilton v. Tex. Dep't of Transp.*, 85 Fed. Appx. 8, 15 n.7 (5th Cir. 2004) ("We might be persuaded to find direct evidence of causation if Hamilton alleged that Corder acted merely as Rodriguez's 'cat's paw' . . . .") (citation omitted); *Lott v. Kenedy Indep. Sch. Dist.*, No. SA-08-CV-935-XR, 2010 U.S. Dist. LEXIS 37991, at *8-9 (S.D. Tex. Apr. 16, 2010) (using cat's paw analysis to evaluate plaintiff's claim that one board member's comments influenced the board's decision to not renew plaintiff's contract).  Assuming that the cat's paw analysis applies in direct evidence cases, the Court concludes that Wood was not Lewis's cat's paw because there is no evidence that Lewis had the requisite influence, control, or leverage over Wood's decision to not hire Swafford.

In addition to the aforementioned lack of direct evidence that Lewis had a role in the decision-making process, the evidence demonstrates that he also had no influence over Wood, the titular decision maker.  Wood testified that after receiving Hojem's assurances, he did not have any concern about whether he must hire someone of Lewis's choosing.  After learning about the events during the February 7 morning meeting, Hojem took swift action, informing Lewis that "this [expletive] was going to stop, this CAM was inappropriate, it made no sense[,]" and that "there would be no further action."  Further, Hojem was at the Big Hill site on the day of the interviews to ensure that Lewis did not participate.  However, the EEOC argues that Hojem did not follow up with Wood to make sure Lewis was not involved or retaliating, yet Hojem testified that she did.  *See, e.g.*, CLERK'S DOCKET NO. 40-4, at **125-26, 129-30 (noting that Hojem instructed Wood to call her if any issues arose following her onsite visit for the interviews, and that in the normal course of her work, she asked Wood how everything, including his relationship with Lewis, was going).  The

EEOC has not adduced direct evidence that Wood was in any way influenced by Lewis when deciding who to hire, as required for Wood to be considered Lewis's cat's paw.

## II.      Circumstantial Evidence

The EEOC argues that it has presented circumstantial evidence sufficient to raise a genuine fact issue.   As noted, the *McDonnell Douglas* framework procedure for summary judgment proceedings in circumstantial cases is as follows:   (1) plaintiff presents a *prima facie* case of discrimination; (2) defendant offers a legitimate, non-discriminatory reason for its action; and (3) plaintiff rebuts defendant's reason by showing that it was merely a pretext for discrimination.  *See Jackson*, 602 F.3d at 378 n.12 (quoting *Reeves*, 530 U.S. at 142-43).   "'Although intermediate evidentiary burdens shift back and forth under this framework, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Id.* at 378 (citation and internal quotation marks omitted).

### A.      *Prima Facie* Case

DynMcDermott does not assert, and in fact assumes, that the EEOC has presented a *prima facie* case of discrimination.  Therefore, the Court will proceed to determine whether DynMcDermott has offered a legitimate, non-discriminatory reason for its decision to hire Thomas and not Swafford and whether the EEOC has shown that reason to be mere pretext for discrimination.  *See Patrick v. Ridge*, 394 F.3d 311, 316 (5th Cir. 2004).

### B.      Legitimate, Non-Discriminatory Reasons

DynMcDermott offers myriad reasons why Wood selected Thomas over Swafford.  To satisfy its burden of production, DynMcDermott's reasons must be articulated "with 'sufficient clarity' to afford [the EEOC] a realistic opportunity to show that the reason is pretextual."  *Id.* at 317 (finding

that the employer's reason, that the plaintiff was not "sufficiently suited" for the job, without more evidence clarifying or expanding on the statement, was insufficient to overcome *prima facie* case) (quoting *Burdine v. Tex. Dep't of Cmty. Affairs*, 450 U.S. 248, 255-56 (1981)).  DynMcDermott may rely on subjective reasons, so long as it provides "in some detail a more specific reason than its own vague and conclusional feeling . . . ."  *Id.*  ("If the [defendant] believed—and had verbalized —that [the plaintiff] was not 'sufficiently suited' . . . because of her experience, credentials, attitude, or some other such articulable characteristic, the [defendant's] reason might have provided enough detail to enable [the plaintiff] to attempt to show pretext.").

DynMcDermott contends that it chose to hire Thomas instead of Swafford for the following reasons:  (1) Thomas had more recent scheduling, planning, and logistics experience, whereas Swafford had not been performing those activities since he ceased working for DynMcDermott; (2) Thomas had more recent and continuing experience using SAP; (3) Wood believed that Thomas interviewed very well; (4) Wood thought that Thomas communicated better; (5) Wood found Thomas to be more energetic and outgoing; (6) Wood felt that Swafford had previously been an average employee who lacked initiative; and (7) Thomas scored one point higher on the Candidate Evaluation Form ("evaluation form") than did Swafford.  The EEOC argues that this evidence fails the test provided in *Patrick v. Ridge*.  *See id.* at 316-17.

Standing alone, reasons three through six may be insufficient to rebut the *prima facie* case.  However, reasons one, two, and seven provide additional context and explanations for why Swafford was not hired.  *See Sullivan v. Paulson*, No. 3:06-CV-1033-BF ECF, 2007 WL 1790892, at *7 (N.D. Tex. June 20, 2007) (finding that defendant's statement that plaintiff was not sufficiently suited for position was not pretext because defendant further noted that plaintiff was only able to "meet" the

position's requirements and selecting officer stated that plaintiff would struggle in position because of complexity of duties).   Also, Wood elaborated on reasons three through six, providing details about his thoughts.   *See* CLERK'S DOCKET NO. 40-3, at **183-90, 203-05.   The Court concludes that DynMcDermott has met its burden.

### C.     Pretext

Because DynMcDermott satisfied its burden of producing legitimate, non-discriminatory reasons for its decision, the burden shifts to the EEOC to show that the reasons given are false or that Swafford was "'clearly better qualified'" for the scheduler position.   *Hixson v. Houston Indep. Sch. Dist.*, No. 4:09-CV-3939, 2011 WL 3648104, at *16 (S.D. Tex. Aug. 17, 2011) (citing *Price v. Fed. Express Corp.*, 283 F.3d 715, 721-23 (5th Cir. 2002)); *see Reeves*, 530 U.S. at 142.   The EEOC contends that the circumstantial evidence raises a fact question about whether Lewis influenced Wood's decision, despite the direct evidence to the contrary.   Additionally, the EEOC challenges DynMcDermott's statements about Thomas's qualifications, particularly the evaluation form, which showed a one-point advantage for Thomas based on his scoring higher on "education," and Thomas's experience with SAP.   Further, the EEOC notes that contrary to Wood's recollection that Swafford was an average employee who lacked initiative, Swafford's supervisor at the time rated his work as "above performance requirements."   Finally, the EEOC argues that Lewis's and other "top-level directors['] comments about the "aging workforce" demonstrate pretext.

### 1.     *Influence*

As previously noted, Wood testified that after his conversations with Hojem, he no longer

had any concern about who he would hire, despite Lewis's statements and actions.[3]   The EEOC

asserts that "[a]lthough Wood repeatedly expressed fears to Hojem that Lewis would retaliate against

him, Hojem never followed up to ensure that retaliation would not occur, and she has no knowledge,

even today, as to who actually made the hiring decision[.]"  In her deposition, Hojem testified that

following the day she was onsite for the interviews, she never specifically discussed the issue again

with Wood, but she did ask him how his life at Big Hill was going.   On the day she attended the

interviews, she informed both Wood and Lewis that no retaliation would occur.   She had no issues

with Lewis's performance evaluations of Wood following this incident.   Hojem left open the door

for Wood to contact her if any issues arose, and as he testified, none did.   Hojem's lack of direct

---

[3] As an example, near the end of Wood's deposition, the following colloquy occurred between the EEOC's counsel and Wood:

EEOC:  Okay. Just so I'm clear, Mr. Wood, it's your testimony here today that Mr. Lewis had no involvement in your decision to choose Mr. Thomas for the position of scheduler/planner in 2008?

Wood:  That's correct.

Q:  Okay.  And it's your testimony that the threatened CAM had nothing to do with your decision-making process?

A:  That's correct.

Q:  What about statements that Mr. Lewis made about Mr. Swafford bing too old and his wife being sick and he'd miss too much work, did those have any influence on your decision making?

A:  No, sir—ma'am, they did not.

Q:  Either good or bad?

A:  No.

Q:  I mean, did it influence you either way?

A:  No.  Once I talked to Deborah Hojem, those comments did not have any effect at all.

Q:  And that's because she told you don't worry about it, everything's okay?

A:  And that she would be part of the hiring process.

CLERK'S DOCKET NO. 40-3, at *236-37.

action following her onsite visit at Big Hill does not raise a question of material fact regarding whether Lewis influenced the hiring decision such that DynMcDermott's proffered reasons are false or pretext.

As evidence that Lewis influenced Wood's decision, the EEOC refers the Court to Nelson's deposition, arguing that it presents some evidence that Wood had already decided to hire Swafford prior to February 7.  During her deposition, Nelson stated that at the February 7 meeting, Wood said that he had already interviewed several candidates and that he wanted to choose Swafford.  Later in her deposition, Nelson testified that she was only stating what she remembered being said but that it was not a verbatim recounting or the exact words.  All of the other record evidence, including Swafford's own charge of discrimination filed with the EEOC, indicates that the interviews did not occur prior to the February 7 meeting, but on or about February 27.[4]  Nelson's imprecise recollection does not raise a fact issue about whether Lewis influenced Wood's decision such that DynMcDermott's reasons for hiring Thomas are false or mere pretext for discrimination against Swafford.  *See Sanches*, 647 F.3d at 165 (noting that speculation is not sufficient to avoid summary judgment) (citing *Recile*, 10 F.3d at 1097).

## 2.   *Evaluation Form and Qualifications*

The evaluation form Wood completed and sent to human resources as part of his decision to hire Thomas permits the interviewer to enter scores between zero and two in the following categories:  education, experience, technical skills, communication skills, interpersonal skills, and customer service skills.  *Id.* No. 59-6, Exhibit 1.  A score of zero means that the candidate did not

---

[4] Wood's charge states that his interview occurred on February 26.  *Id.* No. 106-1.  The remaining testimony establishes February 27 as the date of the interviews.  Regardless, the record evidence shows that the interviews occurred after the February 7 meeting.

meet the minimum requirements; a score of one means that the candidate met the minimum requirements; and a score of two means that the candidate met both the minimum and preferred requirements. *Id.* Swafford and Thomas scored a two on all but education, where Thomas scored a two and Swafford a one. At the time of the interviews, Thomas claimed to have earned a bachelor's degree; Swafford had an associate's degree. Wood stated that in addition to college education, he also considered Thomas's military training in planning, scheduling, and logistics. *See id.* No. 40-3, at *186-87. A college degree was not a prerequisite for the position. *Id.* at *187. Wood also indicated that even if he wanted to, he could not give a candidate a score higher than a two. *Id.* at *186.

After deposing Thomas, the EEOC learned that he actually does not have a college degree, a fact that he had misrepresented to DynMcDermott. At the time of his interview, Thomas had earned approximately 100 hours towards a degree in Philosophy. *See id.* No. 111-1. The EEOC contends that Wood's failure to verify Thomas's educational achievements beyond what Thomas represented raises a fact issue about whether Thomas's higher score on education on the evaluation sheet was really a reason for hiring him over Swafford.

First, the Court notes that Wood stated that he also considered Thomas's military training as part of the education ranking. *Id.* No. 40-3, at *187. Wood was consistent in his practice of considering non-college education in his ranking of candidates because he also ranked the third person interviewed as a two in education because of that individual's non-college training. *Id.*

Second, there is no record evidence that Wood verified any of the details in any of the three candidates' applications, not just Thomas's background. "An employer has every right to rely on the representations made by an applicant . . . ." *Bailey v. Anne Arundel County, Md.*, 259 F. Supp.

2d 421, 432 (D. Md. 2003) ("Neither Title VII nor the ADEA imposes a duty on an employer to

verify statements contained in an application indicating that the applicant satisfies the minimum

requirements permitting him or her to be considered for the position at issue.").

Third, the relevant inquiry is what Wood knew at the time of the decision to not hire

Swafford.  *See Reynolds v. Dallas Area Rapid Transit*, No. Civ. A. 3:98-CV0982M, 2000 WL

1586444, at *7 (N.D. Tex. Oct. 20, 2000) ("Reynolds' attempts to [prove pretext] by urging that

DART came to know, after it promoted Lastre, that he falsified his educational background, but it

failed to act upon this new information.  That evidence is irrelevant to a showing that DART's

proffered reason [Lastre scored higher score on evaluation form] is pretextual."); *see also Patrick*,

394 F.3d at 319-320 (recognizing that "the ultimate issue is the employer's reasoning at the moment

the questioned employment decision is made").

Additionally, differences in qualifications are generally insufficient to raise genuine fact

issues.  *See Lopez v. Kempthorne*, 684 F. Supp. 2d 827, 863-4, n.27 (S.D. Tex. 2010) (noting that

to demonstrate pretext, a plaintiff can show that she was clearly better qualified for the job) (quoting

*Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 356-57 (5th Cir. 2001)).

> However, the bar is set high for this kind of evidence because differences in
> qualifications are generally not probative evidence of discrimination unless those
> disparities are "of such a weight and significance that no reasonable person, in the
> exercise of impartial judgment, could have chosen the candidate selected over the
> plaintiff for the job in question."

*Celestine*, 266 F.3d at 357 (quoting *Deines v. Tex. Dep't of Protective and Regulatory Servs.*, 164

F.3d 277, 280-81 (5th Cir. 1999)).  Further, courts should not "'substitute [their] judgment for the

employer in evaluating what types of experience are most valuable for an employee.'" *Estraude v.*

*United States Dep't of Agric.*, 166 Fed. Appx. 712, 714 (5th Cir. 2006) (quoting *E.E.O.C. v. La.*

*Office of Cmty. Servs.*, 47 F.3d 1438, 1445-46 (5th Cir. 1995)).

There is no dispute that both Swafford and Thomas were qualified for the job. The question is whether Swafford was so much more qualified than Thomas that no reasonable person could have chosen Thomas over Swafford. *See Celestine*, 266 F.3d at 357 (quoting *Deines*, 164 F.3d at 280-81). Both individuals have some experience with the duties of the scheduler position: Thomas in the military, and Swafford during his previous tenure as a scheduler at DynMcDermott. The primary area of disagreement appears to be each candidates' experience with SAP. The parties agree that using the SAP software program is an essential duty of the scheduler position. The EEOC contends that the version used by DynMcDermott is unique, implying that Swafford's experience with that version elevates his qualifications above Thomas's. DuBois and Houston declared that SAP had to be specifically modified to DynMcDermott's needs,[5] but Wood testified that the scheduling, planning, and logistics modules were "basically the same in SAP." CLERK'S DOCKET NO. 40-3, at *197; *see id.* NOS. 59-3, 59-4. Viewing the evidence of both Swafford's and Thomas's qualifications in the light most favorable to the EEOC, the Court concludes that Swafford's qualifications were not "'of such a weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Thomas] over [Swafford] for the job in question.'" *Id.*

### 3.    *Swafford's History at DynMcDermott*

Wood explained his comments about Swafford being an average employee who lacked

---

[5] DuBois also declared that DynMcDermott's version of SAP "was not utilized by or available to any other employer." CLERK'S DOCKET NO. 59-3, §5. DynMcDermott objected to paragraph 5 in DuBois's declaration, stating that she had no basis for her opinion other than a conversation with her domestic partner who works for a different company. *See id.* NO. 74-5, at **81-84. However, the deposition testimony cited by DynMcDermott only refers to DuBois's personal knowledge about other companies using SAP, not the remaining portions of paragraph 5. *Compare id.* with *id.* NO. 59-3, §5. Because declarations must be based on personal knowledge, the Court sustains this objection insofar as it relates to the sentence quoted above and overrules it insofar as it pertains to the remainder of paragraph 5. No objections were lodged against Wood's testimony or Houston's declaration.

initiative, stating that even though he was not Swafford's supervisor when Swafford was previously

employed by DynMcDermott, he still observed the various personnel as he "walked [his] spaces."

CLERK'S DOCKET NO. 40-3, at *203-04.  He noted that some employees, upon finishing a project,

would "come back into the electric shop, sit down and drink coffee, and not be . . . aggressive to go

say[, ']Hey I need another work to go out.[']  And so just wait to be assigned." *Id.*  He did not

observe Swafford "do anything wrong, but [he] didn't see [Swafford] be aggressive, basically." *Id.*

Wood explained that this knowledge was "something [he] knew in [mind]" about Swafford but was

not on the evaluation form.  *Id.*  Wood's subjective belief about Swafford was merely one of the

legitimate, non-discriminatory reasons for the decision to not hire Swafford and does not raise those

reasons to pretext for age or disability-association discrimination.  *See Manning v. Chevron Chem.*

*Co., L.L.C.*, 332 F.3d 874, 882 (5th Cir. 2003) ("The mere fact that an employer uses subjective

criteria is not, however, sufficient evidence of pretext.").

4.    *Aging Workforce*

The EEOC also argues that comments about the "aging workforce" and pending retirement

of certain employees, made by Lewis and other "top-level directors" raises a fact issue about pretext.

First, the Court notes that none of the "top-level directors" are named in the record, with one

exception, nor are the dates they allegedly made statements regarding the "aging workforce."

Regarding the one exception, in their declarations, both DuBois and Houston mentioned having

heard Heusel discuss "DynMcDermott's 'aging workforce' and its effect on the workplace, including

the increasing costs of workplace benefits."  *See* CLERK'S DOCKET NO. 59-3, ¶ 26; *id.* NO. 59-3, ¶

13.  Assuming all of these statements were made, they do not raise an issue of pretext because they

do not "refer in any way to [Swafford's] age, let alone the age of any applicant or employee, or the

-24-

employment decisions of which he complains." *Hixson*, 2011 WL 3648104, at *17 (citing *Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1061 (5th Cir. 1998); *Turner v. N. Am. Rubber, Inc.*, 979 F.2d 55, 59 (5th Cir. 1992)).

Many of Lewis's statements about the "aging workforce" more directly relate to the hiring of a new planner/scheduler.  Generally, Lewis was concerned with being able to replace people who retired with others who would work in the company for a long period of time.  However, even assuming that Lewis's statements related directly to the decision at issue, because he did not have any influence over the hiring decision, as the Court has already found, his statements cannot raise a genuine issue of pretext.

None of the EEOC's proffered circumstantial evidence raises a fact issue that but-for Swafford's age, DynMcDermott would have hired him; nor does the evidence demonstrate that Swafford's association with a person with a disability was either a but-for cause of DynMcDermott's decision or a motivating factor in its decision.

The Court concludes that the EEOC has not presented sufficient direct or circumstantial evidence to overcome summary judgment.  Thus, the EEOC has not met its burden under the but-for causation standard of the ADEA, or either the but-for or mixed motive standard of the ADA, whichever standard is applicable.

## III.    Liquidated and Punitive Damages

Having found that the EEOC has not presented sufficient direct or circumstantial evidence of intentional discrimination to overcome summary judgment, the Court further concludes that summary judgment is proper on the EEOC's claims for liquidated and punitive damages.  Therefore, the Court will grant DynMcDermott's motion.

ORDER

IT IS THEREFORE ORDERED THAT *Defendant's Amended Motion for Summary Judgment* [Clerk's Docket No. 40] is in all things **GRANTED**.  The Court will enter Final Judgment by separate order.

IT IS FURTHER ORDERED that Plaintiff's claims are **DISMISSED WITH PREJUDICE**.

IT IS FURTHER ORDERED that all pending motions are **DENIED AS MOOT**.

IT IS FURTHER ORDERED that all costs of court shall be borne by the party incurring the same.

SO ORDERED.

SIGNED this the 15 day of **February, 2012.**

Thad Heartfield
United States District Judge

-26-